Good morning, your honors. May it please the court, Thomas Poore for Mr. Ramirez. I'm a court-appointed attorney for Mr. Ramirez. I have four issues to present to the court. The first issue I am presenting is regarding the special verdict that was requested of the court pursuant to the Southwell decision. The special verdicts were getting a lot of attention. Do we have a decision on that? I've never, frankly, seen a special verdict in a criminal case. We were getting quite a few when weight of mainly marijuana or cocaine became an issue in a case and it wasn't clear whether it was an element or not. Oh, during that Blakeley period? Yes. I guess I wasn't practicing or a trial judge then, but that's different from this. Just the general idea of a special verdict and when to use it, when should you use it, should it be used, that sort of discussion was taking place. And I had, in fact, had a jury trial just, I think it was just before this, where it was a marijuana case and the judge gave a special verdict. Curiously enough, the jury didn't answer the special verdict. Why would you want a special verdict instruction here except to say twice what you already said once? You have to be unanimous. It was not stated that way as unanimous. It was stated with all of you agreeing. But I think Difference in meaning? I guess yes. I mean, unanimous and with all you agreeing are two different, they're the same idea, but What's the difference? I don't think there is any difference in effect, but I mean, it's just, some people understand the word unanimous and some people may understand the word with all of you agreeing in a different way. Now, the jury instruction that was presented in Southwell, it was clear to me, I understood it, but I'm an attorney, so I could understand that. But the court was concerned that the judge might not understand it. And Southwell came about from a jury question. So the reason that I presented a special verdict in this case was to avoid the problem that arose in Southwell. Actually, the same problem arose, but it's on my second point. That somehow or another, the jury has to unanimously reject the affirmative defense. Now, the question arises whether it is in all affirmative defenses or just insanity. Now, the burden is different in insanity versus every other affirmative defense. And I think that was the issue that concerned the court in this matter. Well, but in Southwell, as I understood it, what the court was worried about was that the jury could have reasonably read the jury instructions in one of two ways. Therefore, there was an ambiguity in the original instructions. That case doesn't even discuss the use of special verdict forms. Instead, concerns the affirmative defense for insanity. In this case, the instructions, the jury instruction properly said, the government must prove beyond a reasonable doubt, with all of you agreeing that the defendant did not act in a reasonable self-defense. Now, it doesn't seem to me to be any ambiguity in that. I think that in Southwell, they point out that the instructions weren't clear as to what the jury should do to that result. I remember it a little differently. And I may be relying too much on memory because I was on the panel, and I may be wrong about what we actually said in the written decision. So you explain it. What happened, if I remember right, is the judge said to the jury, you have to be unanimous that the defendant committed each element of the crime. And then the judge presented an insanity instruction, which is a defense. And the jury said, we're unanimous on every element of the crime, the malice, the damage, the fire, and the commerce. But we don't agree unanimously on whether he was sane or insane. Do we have to be unanimous on whether he was sane or insane? And the judge wouldn't tell him. Yes. Here, it's not an affirmative defense that's really at issue, as far as I can tell. They just want to know what mental state, what intent is necessary. And he already told them. That's the second issue. I'm back at the special verdict issue. I asked for a special verdict jury instruction regarding self-defense. I wanted it to be clear that the jury was rejecting the self-defense argument. The instruction just says that it gives the regular instruction, and then it says the government, in the last paragraph, it says the government has proved beyond a reasonable doubt that the defendant did not act in self-defense. It doesn't say what you do. If the jury, if that's shown, it doesn't say anything, then the substantive offense can be proven. It doesn't give the jury any instruction what you do. The three or four or five words, with all of you agreeing, does not do anything to the instruction. That's exactly what the instruction said before those words were added. It just kind of clarifies that instruction. But once you get, once the jury hears that instruction, and yeah, we think that the state, the government proved beyond a reasonable doubt that he did not act in self-defense, it doesn't tell them what to do then. Sure. I've got, we've all got the instructions right here in Appley's Supplemental Excerpts Volume 2. Show us the ambiguity that needed to be fixed. The ambiguity is it doesn't say what you do if you find that the government proved that the defendant did not act in self-defense. Well, it says right here at page 536, it says the government must prove beyond a reasonable doubt with all of you agreeing that the defendant did not act in reasonable self-defense. What's the ambiguity? The ambiguity is what do you do if you find that? What do you do? I mean, do you, is that, what do you do if you don't find that? Well, but just a minute, as I understood the instruction, we're, we've got a lot of other instructions about what the government has to prove, and then we come to this instruction that says the defendant's offered evidence of having acted in self-defense. Force, and, in other words, he's trying to get out on self-defense. The government must prove beyond a reasonable doubt with all of you agreeing that the defendant did not act in reasonable self-defense. If the government doesn't prove it, then self-defense is in and he's out. That's why they have the defendant argue. Well, even What's ambiguous about ambiguity? What is the ambiguity about that? Because one or two of the jurors could think that he didn't, the government didn't meet their proof, but it doesn't say that if you, if you don't find that, that you've got to find him not guilty. But you've got all the instructions, which I read all the instructions all the way through. Once you read all the instructions, there's no question. If you, if the government doesn't prove beyond a reasonable doubt that he didn't act in self-defense, then they don't prove their case. There's no instruction? It seems like there, there is at page 537. If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. Now, I realize, you know, I am quoting you things a piece here, a bit there, but what I did, I guess what most lawyers do in closing argument is that tell the jury what I want them to do and then show them the judge is going to tell you this. And that's why you have to do what I'm suggesting you do and quote the good parts. It seems like you've got all the good parts. Wasn't the judge, wasn't the judge legitimately concerned about shifting the burden from the government to the defendant? He actually, he was going to give the special verdict all along and then he went out and read the Pierre case, which was a self-defense case. And in that case, there wasn't any instruction that the government had a burden to prove the defendant did not act in self-defense. That's where all these other cases came from. That's why the burden was such a large issue in those cases. But that wasn't the problem here. The problem here was the Southwell getting the jury somehow or another to be able to say, we don't think he acted in self-defense. And yes or no, did he act in self-defense? No. And I think after Southwell, there needs to be some clarification of that point. The second issue is the question that came from the jury in this particular case, and that involved the element of specific intent. Now, the defendant was charged with four counts, each one of them involving two women, two women were involved in four counts each. So they were asked to specifically, did the defendant specifically intend to harm or injure these two ladies in two counts? And did they specifically, did he specifically intend to murder these ladies in two other counts? They came back and said, what does specific intent to murder mean? Was their question they sent out? This issue is important because this came at the end of one of the, I believe, the first day of deliberation, or one of their days of deliberation. We retreated to the library to wait for a verdict, and we got a call from the clerk, there's a jury question. Okay, usual procedures, go back to court and talk to the judge about the jury question. And the jury questions are usually like, how long was the knife, or something very inconsequential. But in this case, it was about specific intent, which is not an, it's a very, a very deep concept I guess you would say, because there's a lot of discussion about it in, certainly in the, I offered the specific intent instruction 5.4, but the 5.4 is not really an instruction, it just says, you know, we're trying to avoid specific intent in instructions. And the court took that to mean, I believe, mean that we don't use it anymore. Was there any, it looked to me as though the judge, well first of all, what specific intent means? It just means not just any kind of intent, but here's the particular intent you have, or an intent to hurt somebody, and you just take it from the statute. And then when I looked at the instructions, it looks like you've got a specific intent instruction for everything where some specific intent was required by the statute. About the only thing wrong with it is that the form books now say, don't say specific intent, because the words are novel to people, but it's not error to give them. So, it looks like you already got your specific intent instruction. You could emphasize it and argue it or not argue it, whatever you found tactically advantageous. And I don't see what more the judge could say except to repeat himself. I don't know what, where it would have been defined in the instructions. Well, I gave the standard 8.4. What's to define beyond what he said? Third, the defendant did so with the specific intent to commit murder. When you read that, it means it's not enough if he intended to hurt her. It's not enough if he intended to disfigure her. It's not enough if he intended to make her fear him. He's got to have specifically intended to murder her. But the jury asked. The jury was confused. Well, but you didn't help the judge very much. The judge says, what shall I do? You both agreed. Current instructions address the jury question. The jury should be referred to the prior instruction. And he did. You all agreed to that. Now you're coming in here and saying to us, it's a big problem. What did you agree to it for? I've been on the court of appeals now and say, well, that judge was totally out to lunch when I didn't even tell him the. I started it and I didn't finish it. We got the message the night before. We're waiting for it to be called in the court. The next message we get was the jury's gone. Go home. I said, well, what happened to the question? Come back in the morning. We'll get handed the question. The judge comes in and in about two minutes, maybe, he makes his decision. He's already. So he is. I mean, jury questions come in and the lawyers are brought into court and they get a chance to address it and the judge gives it back. And you don't like to have three hour recesses while the jury forgets about everything. You like to let them stay on task. Right. But we had no time to review the issue. Did you ask for more time? The jury was sitting out in the hall. I mean, it was like. I mean, did you did you say to the judge, judge, I think there's a case I got to research it. Would you give me 20 minutes or something like that? No, I didn't. I mentioned that. I says we should at least tell him you're not going to define it. But he had defined it. Well, he didn't think he had because he says I'll just leave it like it is. I won't define it for them as per their question. Well, it seemed to me that what he was saying is it's already defined. Go look at the instructions. I've already got it in there. I perhaps that was his feeling, but I don't see where it is. I don't think it's defined and that's the natural result of what took place. He had to have been. Committed to the idea that all of the instructions were there in total as a group, as a whole. This is a superfluous question because you've already got all the all the and unless you specifically are going to tell either you or opposing counsel suggest to the judge you've got this specific thing that you want done, you know, a court can't speak unless it's spoken to. And we can't just sue a sponte, jump off into doing things, especially tangling around with instructions and juries while they're out deliberating. There's nothing that trial judge hates more than questions from a jury. They they can gob up the entire record and do so without anybody's fault or problem. So you hate them to begin with. Number two, you want direction from the counsel telling you what's the best thing to do and argue it on the record and then and then do whatever is there. But this happens. This happens frequently. And frankly, I think the judge did exactly what it should have done. That is, say, you've already been instructed. Look at the instructions. Reread them. Do whatever. Well, in any event, that was more of a comment than it was a question. Does this to this district court, they vary some in their customs. I always used to give the jurors 12 Xerox copies of the instructions and they'd all mark them up in circle commas and stuff. And some judges just give them orally and that's it. And some just give them one copy. So nobody marks on it. What was the custom in this court? I can't recall. I think the judges vary within the courthouse. I'm trying to remember. Remember at this trial what the custom is? I can't remember. But Judge Zapata was a public defender and I think he probably sent copies into the jury. I'm thinking it would be easy for a jury. Southwell, you could read it one of two ways. Either they're hung when they disagree on insanity or they have to return a guilty verdict if they disagree on insanity because the burden of proof on insanity is on the defendant. So we said he should have helped them on that. Here, it's right in there. All you needed was some juror to underline it and show it to the other jurors. That's why I'm wondering whether they had the document. I'm not sure. I just don't know. I can't recall. I have two more issues. One is an improper questioning issue by the government and there was no objection made at the time. If you want to reserve time, you don't waive anything by not arguing. All right. I would reserve a little time here. I've got a minute. Thank you. Good morning. Assistant U.S. Attorney George Furco may it please the Court. At the outset, let me apologize for the errors I made in the excerpts of record and I know it caused a great inconvenience to the members of this Court as well as your law clerks and I apologize for that. Let me talk first about the special verdict in the self-defense form. Could you help me with something that's more on my mind? Yes, Your Honor. I actually didn't see anything wrong with the prosecutor asking Ramirez, are you calling your girlfriend and her mother liars? However, we have a case, Geston, that says there is something wrong with it. You're not allowed to ask it. Okay. Was there objection when the prosecutor asked, are you calling your mother and her girlfriend liars? No. There was no objection. I'm sorry. I'm sorry. Can I have the question again, please? Did the defense object when the prosecutor asked Ramirez whether he was calling his ex-girlfriend and her mother liars? No, there was no objection. It's plain error review, Your Honor. And let me move on to the prosecutorial misconduct claim then. The government submits that there was no error at all. There was certainly no plain error and a possible way for this Court to resolve the matter is simply to do what it does in ineffective assistance claims, not look at any error or mistake that the defense attorney made and simply jump to the prejudice prong. But first let me point out, I did submit a 28-J letter, the DiAquino case that dates to 1951. And that case would indicate that there is an intra-circuit split within the Ninth Circuit as to whether or not the prosecutor's questions were improper in the first place. DiAquino would support the proposition that it was not an improper question concerning the veracity of a witness. I recognize, of course, that the Combs-Sanchez-Geston line of cases are contrary. It seems to me that there is an intra-circuit split that exists right now on that very issue. So the error, by definition, could not be plain. So you're saying we ought to send it up on bulk? That could be an option, but I don't think that the Court has to reach that option, Your Honor. And for the reason that I suggested, that an easy way to resolve this is as it claims. The Court routinely, this Court and others routinely, don't even address whether or not an attorney was deficient in the performance if it could be resolved on the prejudice prong. And in here, the district court found that the evidence was overwhelming. The defendant really makes no effort in his opening brief and a perfunctory effort in his reply brief to try and show otherwise. And there was, in fact, overwhelming evidence of case, which He had two eyewitnesses to the assault, of course, Teresa and Dolores Valenzuela. But even without their testimony, assuming that they had died of their wounds, the government would have had a strong circumstantial evidence case on murder in the second degree and or manslaughter just based on the circumstantial evidence that was presented in this case. Namely, the defendant was armed. He came to the house armed with a butterfly knife. Supplemental excerpt of record page 445. He had been obsessed with Teresa. He was a jilted lover. He knew that he was not welcome at the Valenzuela home, although he differed as to why he was kicked out of the home. That's on supplemental excerpt of record page 425. He came at a time when he knew, and I'm going to call him the father and brother, but it's Luis Sr. and Luis Jr. He knew he came at a time he knew that they would not be home. He carried latex gloves. He was wearing dark clothing on an unseasonably warm day. He made a statement to the police, I know I will go to hell for this. He also made another statement to the police, just let me die, let me die. He also made another statement, I can't go to prison. He had strong motive for committing these crimes. Namely, he stole $10,000 from Dolores Valenzuela. Both of the women had defensive wounds. They had a combined total of about that were explained by the forensic pathologist and the doctors on supplemental excerpt of record pages 271 through 275. So even without their testimony, you had a strong case of overwhelming evidence. Moreover, the defendant's testimony was simply painfully unbelievable and under this circuit's precedent, the jury can draw the opposite conclusion if they believe that he was not telling the truth. The testimony was corroborated by numerous witnesses, and that's just the overwhelming evidence prong of it. If you also look to other aspects of the case, there was no objection. This is not a case where there was like in Combs or Sanchez where the prosecutor badgered the witness, so to speak, into trying to force the witness to call other witnesses liars. The defendant was, a question was put to him, he answered it without objection. And the defense, not only did the defendant not object contemporaneously at the scene, but he filed a motion for a new trial where that issue was not even raised in the motion for a new trial. I think a reasonable inference from that is that it went over everyone's head. Most importantly, it went over the heads of the jurors. They didn't realize the import of what was going on. Well, the prosecutor also did not make any reference to this during closing argument. And I was about to get to that point, too. That's right. In Combs, Your Honor, I understand that, but in Combs, it was viewed as especially troubling, and I think it might have been guessed in Sanchez as well, where the improper questioning was exacerbated by repeating it in closing argument. Absolutely not present in this case. So it was not repeated during closing argument, as Judge Mills indicated. They were lay witnesses. They were not police officers. And it's generally more troubling when a question of that sort is put to a police officer, given that they do come into court with respect to the community. So this case is really not at all. Yes, Your Honor. I'm just curious about something else. Certainly. I don't think it's going to affect the outcome, but I'm curious. Was there any testimony here about why this fellow Ramirez brought latex gloves? He denied bringing latex gloves, but the latex gloves were found on the scene by the police officers. They weren't found in his pocket? They were just found at the scene? No, I believe they were found in his pocket. I could be wrong about that, but I believe that they were found in his pocket. He denied during his examination that he had carried them there. If they were at the scene, it could be for washing dishes and not having a soapper at your hands. Certainly. There could be, I suppose, there could be innocent explanations for them. There could have been some cocaine powder on them. There could be a lot of inferences that can be, but I think if you put it all together, they certainly go with a plan that he came there with the intent to assault these two women. And avoid fingerprints. And avoid fingerprints. Or maybe just keep his hands clean, not get all that gunk on his hands. And not get all the blood on his hands. There could be a lot of reasonable inferences, and that's up to the jury to decide. There was evidence that they were in his pocket, and there was no evidence of an alternative explanation? I don't want to say that for 100%, Your Honor. I don't want to misstate the record. I know that they were found there. I believe that they were found on him, or close by him, and I don't want to misstate the record. And I'll be happy to supplement that. We'll ask if we need to. Thank you, Your Honor. As I also indicated, there is an intra-circuit split. And admittedly, I found that portion of the case fairly late in the day, but I do believe I have an obligation to bring it to the Court's attention. The D'Aquino case from 1951 seems to me to be directly on point, that allowed this sort of questioning, and said that it was not improper for a prosecutor to ask another witness whether that witness was in error. Now I looked up the Black's Law Dictionary definition of it, as well as the Webster's Dictionary definition of it, and the plain meaning of in error would encompass both aspects of a credibility determination. That is, it would cover both truth, and it would cover whether or not the witness was a mistake. This Court specifically said that was not improper, that that was proper cross-examination, I should say, by the prosecutor. And the reason for it, the Combs-Sanchez line of cases, rests on the belief that it's improper to ask the were-they-lying type of questions, because that invades the province of the jury to make determinations as to credibility. So it would be no more proper to ask, no more proper to ask the question of a witness whether or not they're mistaken, as opposed to lying. So I would submit that the D'Aquino case indicates that Is this universal? The way I remember practicing in Alaska was just telling my witnesses, if he asks you whether you're calling somebody a liar, unless you happen to know about what his state of mind is, if you think he's honestly mistaken, you can say that. If you have no idea whether he's honestly mistaken or lying or going on the basis of what somebody else said, you can say that. Just tell the truth. That's certainly true, Your Honor. And They could ask, are you calling the cop a liar? I'm sorry? The prosecutors could ask, or the plaintiff's attorney could ask the person on the stand or defense attorney in a civil case, are you calling the cop a liar? Are you calling somebody a liar where the jury's not going to like having that person called a liar? And then you just deal with it. Do you know if our guest in rule is universal now? There is a fairly substantial, I would say, plurality of jurisdictions, encompassing both federal and state jurisdictions, that say, that essentially follow the Combs, Guest and Sanchez line of cases, that that's improper. There's a significant plurality that do not, that they believe that it should be taken on a case-by-case basis and it may be proper under certain circumstances. There are three states, to my knowledge, and there may be more, but there are at least three states that say it's proper under any and all circumstances. Because really what's going on, when you ask a witness that sort of a question, it's really not, and I think the D'Aquino Court recognized this, it's not a comment on the witness' veracity. It makes no sense for a prosecutor to cross-examine the hostile witness, the defendant, and in this case ask, and Combs, Badger, run to the judge, trying to force the defendant to call the government's main witness a liar. That is not a comment on the veracity of the witness. It is a tool, as this Court phrased it in D'Aquino, by which you juxtapose the defendant's story with the witness' story and thereby you're allowed to, you're having the jury draw an inference that the defendant's testimony is not credible. It really is not, I think, properly understood a comment on the veracity of the police officer or whomever the witness is. Are there, I can maybe think of a couple, but I'd like your help. Are there circumstances where a defense lawyer, knowing perfectly well that the question, are you calling this witness a liar, is objectionable, might tactically decide not to object? Yes. And I think that that happened in this case. Explain. Well, first of all, in the defendant's reply brief, he suggests as much. He suggests that it was a tactical reason. Toward the end of his brief, he indicates, quote, the defense has no obligation or interest in bringing more attention to improper cross-examination. So that suggests that there was just lie in the weeds so that there'll be some error that I can appeal on. I mean other tactics, like where ultimately it redounds to your benefit. And I think that this case actually provides a perfect example of what you're talking about, Judge Kleinfeld, because in this case, there actually would have been a motive for the witnesses to fabricate. Namely, the defendant had stolen $10,000 from Dolores Valenzuela. And in fact, the defendant even testified to that. A follow-up question was, are you saying that she's lying? He answered something along the lines of yes. And then the prosecutor followed up, well, why? I'm sorry, that was phrased towards, well, why? Because they're trying to protect. He asked why as a first-year prosecutor? The prosecutor asked, why would they be lying? And the defendant answered, to protect Dolores and Teresa. And so there could certainly be, this would certainly be a case where that question probably shouldn't have been answered in any event because it really doesn't help the government at all. And actually, it helps the defense. So the why question actually could have been the defense lawyer inviting the prosecutor down the primrose path. They might very well lie to get me in trouble because I'd used her ATM card. Yes, Your Honor. It would have actually supplemented the motive aspect of it. And in fact, it's on page, the correct supplemental of excerpt record page is 459. And the question was to the effect of, all of them said you were asked to leave. That's when there was testimony that Ramirez was told to leave by the brothers. And the question goes on, you were telling us you left on your own. Is that what you're trying to tell us? Answer, yes. They are lying. You were telling us the truth. Yes, they are. Why would that be? They are protecting Teresa and their mom. So that actually undercuts the government's case because it does supply a motive, a reasonable motive, why the victims would have been, why the victims might not have been telling the truth. Of course, the jury rejected that. I have about five minutes left, and I'll take the advisement of the court at the beginning. Yes, sir. First of all, Mr. Rapport did not get to the other issue, and that is the question of the Yes, Your Honor. So would you address that? And first of all, tell me, is there a roster or a membership list of the members of this tribe on this reservation, et cetera? Is there such a thing? I'm not sure if there is or not, Your Honor, but I can tell you what the evidence was presented on that claim. And that is a sufficiency of the evidence claim. And of course, the rule in Jackson applies whether any rational trier can believe in a light most favorable to sustaining the verdict. Sure. First of all, you had both members testify, both victims, Dolores and Teresa, testify that they were members of the Cherokee National Tribe. Yes, I've read all of the facts there, but I'm just asking if there is indeed, does it exist, a list or a directory of the members of the tribe? I do not know if there actually exists in sort of a hard form, but we did have the member, the Director of Membership Services, came in and testified that both members were enrolled members of the Tohono O'odham Nation. They also lived there. They were, and you can only live there if you are a registered member of the Indian. Well, in this day and age, it seems to me that there would be a computer printout of everybody in the tribe. They've got the central offices, et cetera. They have all these people who deal in this all the time, but we don't seem to have just a roster. I can't answer that question why it wasn't produced. It could be that there is a roster and it wasn't produced for evidence, but I don't know that for sure. I do not know whether there is actual roster. I don't think that the Court even needs to reach that because there was plenty of evidence that indicates that both members were Indians within the meaning of 1152. If the Court would like me to address the special verdict form, I'd be happy to do that. Or the specific intent question, I would likewise be happy to do that. Or if the Court has any more questions on the improper questioning, the supposedly improper questioning, of course, I'd be happy to answer any of the Court's questions in that regard. And if not, I have no more questions. I have no more. Thank you. The government would ask that the conviction be affirmed. Thank you very much. Thank you, counsel. I think you had a few seconds. 52 seconds. As far as the Indian roster, there is a roster. They tend to that. The problem in this case is that they applied 10, 20 years before, and then they didn't get their final approval, if you will, until the 27th. This happened on the 24th. Three days later, they get their approval. Actually, the prosecutor is in the back row there, the real-life prosecutor. And she brought in this witness, unknown to me, no previous disclosure. And I asked her, I says, until you have this document, you are not a member of the tribe. Is that right? And she goes, yes, sir. And that was the document that I couldn't find. I couldn't get a copy of it. It was one of the exhibits, either 116 or 117. One was for one lady and one was for the other lady. Both of them came in three days later. I thought there was evidence that they were admitted to the tribe. There was evidence that they applied and that there was some sort of hearing on their application. I thought there was evidence that there was a hearing on the application and they were approved. I believe from the minutes there may have been some sort of approval, but then there's this final document that says, oh, here's your certificate that you are an Indian. Well, didn't they have a certificate of final determination of approval? That was 116 and 117 that came in three days later after this incident happened. And the director got up and said, both are members. And Teresa's mother was enrolled, had the tribal ID. I mean, the evidence is pretty extreme. Well, that was, like I said, it was four days after. It was April 27, 2004. Our trial was 06. So, yeah, that was two years in the past for this lady at that point. You're not suggesting that there was skullduggery involved or that? To become a member of the tribe, you have to go through a process, and one of them is application and approval. And the final approval is the final step. Was there any inference or was there any evidence that they were not members of the tribe? No. Well, let me ask you about something else. I noticed when I skimmed through the cross that when the defense lawyer objected, I don't know if you were a trial lawyer. I was. Often the objections were sustained. So it's not like it was a waste of time to object. And there was no objection whenever Ramirez was asked, are you calling them liars? Now, very often all of us as trial lawyers have not objected to an objectionable question because we're leading our adversary down the primrose path or we thought the answer would be useful to us or we thought it would open the door to something we wanted to get in or because we thought the questioning attorney would just get it in another way, one thing or another. Why should the judge have jumped up and started trying your case for you by objecting himself when you didn't object? Sometimes the first one of these sneaks up on you and you don't hear it. You're taking notes from the last question or something. And I think that's probably what happened when the first question came up, and my attention wasn't fully focused and I didn't realize what had been asked. I'm thinking this question isn't poison. The answer can be great. Yeah, I'm calling them liars. They had a great motive to lie against me because they were really mad at me. And then it opens the door to proving all the evidence about the romance and maybe she was messing around with some other guy and all kinds of bad stuff you could prove. Once the prosecutor opens the door with that silly why question. There was no intent in that, Your Honor. But there could be. And if you're the trial judge, you have no idea what's going on, so you wait for an objection. That's why it matters to me whether there's an objection. Yeah, I didn't object, and then she started repeating it, and it was like this was a very high-charged case because there was a lot of holes in these women and a lot of holes in Mr. Ramirez. I mean, it was about even who was going to die before they got to the hospital. And I think Mr. Ramirez was actually in a more dire state than the two ladies. My opponent. I'm just asking you why the judge should interpose a sua sponte ruling on inadmissibility of the question when there's a potential tactical reason for not objecting and the defense has not objected. I can't answer that, Your Honor. Thank you, counsel. On the latex gloves, the latex glove question, I have an answer to that. Thank you, counsel. United States v. Ramirez is submitted, and we'll hear Daniels v. Henry.
judges: Kleinfeld, Smith, Mills